IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 07-cv-00725-WDM-CBS (consolidated with 07-cv-00726-WDM-CBS)

DAVA DALVIT and DEBRA BENJAMIN,

     Plaintiffs,

v.

UNITED AIR LINES, INC.,

     Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

Miller, J.

     This matter is before me on the Defendant's Motion for Summary Judgment (doc no 28), Defendant's Motion to Strike Declarations (doc no 45), Plaintiffs' Motion to Substitute Amended Declarations In Opposition to Motion for Summary Judgment (doc no 53), and the parties' supplements to their summary judgment briefs (docs no 63 and 70). The motions are all opposed. Upon review of the parties' filings, I conclude oral argument is not required. I have jurisdiction to consider the matter on the merits.[1] For the reasons that follow, Defendant's Motion for Summary Judgment will be granted. Defendant's Motion to Strike Declarations will be granted and Plaintiffs' Motion to Substitute Amended Declarations In Opposition to Motion for Summary Judgment will be denied as futile.

---

[1]Defendant argues in a separately-filed Motion to Dismiss (doc no 83) that Plaintiffs' claims were discharged in Defendant's bankruptcy reorganization and that this affirmative defense deprives the Court of subject-matter jurisdiction. I am not persuaded by Defendant's argument in this regard and conclude that I have jurisdiction to rule on the summary judgment motion.

This is an employment discrimination lawsuit pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Family and Medical Leave Act ("FMLA"). Plaintiff Benjamin began working for Defendant United Air Lines, Inc. ("United") in Denver in 1998. In 2000, she was promoted to the position of ramp supervisor. Plaintiff Dalvit was hired as a ramp supervisor in June 2005. This is a management position; ramp supervisors are responsible for a number of jobs related to ensuring on-time departures of aircraft. Ramp supervisors report to operating managers ("OMs"), who in turn report to department managers. At the top of this hierarchy is the station manager. During the relevant time period, the station manager at Denver International Airport ("DIA") was James Kyte.

At various times after she began working at United, Benjamin requested and received time off under FMLA for migraine headaches. In 2005, her OM was Steve Peters ("Peters"). According to Benjamin, Peters made remarks about her dependability, stating, "You need to be here when you're scheduled to work." Benjamin informed Peters that her time off was pursuant to FMLA and that he should not comment on it. She also complained to the department manager, Kevin Mortimer ("Mortimer"). Mortimer spoke with Peters and reminded him that Benjamin's intermittent FMLA leave was protected and that she was entitled to use it. Benjamin continued to

---

[2]The facts set forth herein are taken from the parties' briefs and attached exhibits and are undisputed, unless otherwise noted. Plaintiffs did not entirely comply with my Trial and Pretrial Procedures, which require that the numbered paragraphs in the "Response to Statement of Undisputed Material Facts" and "Statement of Additional Disputed or Undisputed Material Facts" contain "brief factual explanation" and singular facts, not the extended argumentative paragraphs found throughout Plaintiffs' brief.

take FMLA leave after this incident.

In late 2005, United began assembling a temporary "FIT" ("fix, improve, transform") team, tasked with finding ways of improving performance on the ramp. Mortimer invited Plaintiffs to be on the FIT team at DIA, which was considered a special assignment. At the time, there were six people on the team, three men and three women. Assignment to the FIT team was not a promotion and did not involve a pay raise or other tangible benefit, but several witness testified that it was believed it could assist a team member's professional advancement at United.

The FIT team met in late November 2008. The team was to be supervised by an OM named Steven Nail ("Nail"). According to Plaintiffs and other team members, at the first meeting of the FIT team, Nail informed the team that they could work a flexible schedule and that since they would be working some longer days, they could also work short days. Contemporaneous notes taken by Benjamin show the following:

"Very flexible schedule – no set time"

"Just get tasks accomplished, if need to change days off for whatever reason – no prob"

"Some days longer some days shorter."

Exh. L to Motion for Summary Judgment (doc no 28-15) at UAL DB 1167.

Plaintiffs testified that they asked Nail how they should keep track of their time as the time recording system did not permit employees to input partial shifts; rather, they had to request that another employee make such changes. According to Plaintiffs, Nail told them he would get back to them on this.

In December 2005, less than a month after the initial FIT team meeting, Nail

received a complaint from Peters and at least one other employee that Plaintiffs had been leaving work without having worked full, eight-hour shifts. Nail also learned that Plaintiffs had failed to attend a briefing he asked them to attend to explain the FIT team to other employees. Nail informed Mortimer of these complaints. Mortimer directed Nail to research Plaintiffs' badge histories (showing the times when Plaintiffs swiped their access cards for DIA's secure areas and employee parking lot) for the previous few weeks. Nail obtained the records for Plaintiffs, and then later for all FIT team employees, and prepared spreadsheets showing the approximate times that each FIT team employee was on site. According to testimony by Nail and Mortimer, the spreadsheets showed that Plaintiffs and Denise VanDyke had not worked eight hours in every shift, but rather that some shifts had been longer and some shorter. According to Nail, the other three employees, all of whom were male, had worked eight hours for each shift. The only records in evidence, however, are of Plaintiffs.[3] Nail also testified that all the employees generally informed him of the shifts they were working. Plaintiffs do not dispute that they had left work early on some occasions but contend that they had made up the time on other shifts and that they had acted pursuant to Nail's express authorization in this regard. In addition, they understood from Nail that they were not required to inform him when they were leaving early, although this is required for ramp supervisors not on special assignment.

_____

[3]Plaintiffs contend that all relevant records were intentionally destroyed to cover up evidence of discrimination, which is strongly disputed by United. If Plaintiffs indeed believe this to be the case, the proper course is to move for sanctions and properly brief the issue. I must make a determination on summary judgment based on the record provided and will not speculate about possible improprieties in connection with the absence of material documents.

After being informed of Nail's data, Kyte recommended to Mortimer that another department manager conduct an investigation into whether Plaintiffs had violated United's Code of Conduct, which prohibits falsification of company records. Jean Massey, another department manager and a peer of Mortimer's, was assigned to investigate Plaintiffs. Massey is female and did not report to Mortimer or even work in the same department.

Nail gave Massey the spreadsheets he prepared. According to Massey, Nail informed her that he had told employees their schedules were flexible but that they were still expected to work eight and a half hours a day.[4] Massey and Nail met with the Plaintiffs individually on December 28, 2005. During each meeting, Massy informed the Plaintiff that she was conducting an investigation and had determined that the Plaintiff had not worked full shifts since being assigned to the FIT team. She took Plaintiffs' security badges and told them they were being held out of service until the investigation was complete. Plaintiffs were not paid while they were held out of service. This is a standard procedure during an investigation into serious misconduct; if it is determined that no violation occurred, the employee is paid for that time. Massey testified in her deposition that it was her decision to suspend the Plaintiffs in this manner. Each Plaintiff protested at the meeting that she had worked short shifts but that she had done so with Nail's consent and had made up the time. Indeed, Plaintiff Benjamin obtained and showed Massey the notes from the initial meeting. Nail did not confirm Plaintiffs'

_____

[4]There is some dispute about whether employees were expected to be on site for eight or for eight and a half hours for each shift, but this does not appear to have been an issue in these events.

contention at the meetings with Massey and Plaintiffs were unsuccessful in challenging their suspension at that time.

There is a factual dispute as to whether Massey informed Plaintiffs that the investigation was confidential. Plaintiffs deny that they were told to keep the investigation confidential and, moreover, provide evidence that United's practice is to use a signed confidentiality form for the purpose of ensuring that information about investigations is not disclosed. There is no dispute that Plaintiffs were not asked to sign a confidentiality form. United appears to contend that Plaintiffs should have understood that all investigations are confidential.[5]

That night or shortly thereafter, the Plaintiffs contacted or attempted to contact the other FIT team members to see if they had the same recollections of what Nail had told them about hours and scheduling. Plaintiffs also sought written statements from their co-workers, several of whom agreed to provide statements corroborating Plaintiffs' explanation. Plaintiffs faxed their own written summaries to Massey explaining the what they were told, their understanding of the policy, and their strong denial that they had committed any misconduct. Massey interviewed the other members of the FIT team, who confirmed that they understood Nail to say they could work flexible hours, including more or less than eight hours a day, as long as their total hours requirements were met and the work was done.

Approximately one and a half weeks after they were placed on suspension,

_____

[5]During the investigation, David Jones, a manager and friend of the Plaintiffs, asked Massey about what was happening and she had a brief discussion with him, but the record is not clear about the substance of that discussion.

Plaintiffs contacted United's human resources department in Chicago to complain that their suspension was discriminatory. Plaintiffs contended that male employees on the FIT team had also left early on occasion but only Plaintiffs were investigated and suspended. Mortimer testified in his deposition that he did not learn of this complaint until after Plaintiffs returned to work; there is some evidence, however, that he learned of it while Plaintiffs were still on suspension.[6]

Massey ultimately determined that Plaintiffs did not falsify their time records and that they should be returned to work. Massey, in consultation with Mortimer and Kyte, also decided that Plaintiffs should not be returned to the FIT team because of Plaintiffs' discussion of the investigation with other team members. Other reasons given by Massey for this decision was "credibility, based on the fact that they . . . left during different hours and didn't let their [OM] know what was going on" and that other employees had questioned the Plaintiffs' schedule. Mortimer testified that the reason for Plaintiffs' removal from the FIT team was the "expectation for a member of management is to be at work during prescribed times unless otherwise excused from that." Massey, however, testified in her deposition that Plaintiffs did not violate any provision of United's Code of Conduct; Mortimer testified similarly.

Plaintiffs were scheduled to meet individually with Massey and Mortimer around January 18, 2006. In the meeting, each were given a "letter of counsel," signed by Massey, and stating the following:

> I have conducted an investigation within your FIT

---

[6]Jeanne Nelli of United investigated Plaintiffs' complaint, which was apparently dropped because Plaintiffs did not return Ms. Nelli's call.

Team.  I have concluded that there is insufficient information to support a violation of Rule #9 of the United Airlines Rules of Conduct: Falsification of Company records or reports.

However, your behavior while on special assignment and during this investigation causes me to question your ability as a leader in the organization.  It is clear from the electronic records of your arrivals and departures that you left work early on numerous occasions without authorization of an Operating Manager.  In fact, several members of management and frontline employees noticed your frequent absence and questioned your assignment and schedule. Although you were on a special assignment, you were still responsible for notifying your Manager when you left work early and making up the hours.

In addition, failure to respect the investigative process and share information leaves doubt in your ability to successfully manage employees and lead the department on a special assignment.  I specifically informed you that the investigation was ongoing and I would be contacting other Supervisors.  Yet, you ignored my direction and you called other supervisors to solicit statements from them.

Exh. M to Motion for Summary Judgment (doc no 28-16).  The letter informed Plaintiffs that they would be removed from the special assignment and would be placed on a 90-day action plan, and failure to meet the expectations of the action plan "will lead to discipline up to and including discharge."  *Id.*

There is significant disagreement about the effect of this letter.  It is undisputed that this letter would have to be disclosed if Plaintiffs applied for any other position at United.  Plaintiffs provide evidence that a letter like this would essentially be a disqualifier and could hinder their advancement.  Mortimer testified in his deposition that the letter was not discipline, but Plaintiffs contend he told them at the time that it was. Plaintiffs also testified he told them that instead of being put on an action plan, the letter was to serve as the action plan and would be kept in their files for five years.  Plaintiffs

provide evidence that the usual practice was to keep such letters in an employee's file for two years, but this is disputed by United.

Plaintiffs were assigned to work with Rhonda Patterson-Eachus and returned to work on January 23, 2006. Patterson-Eachus developed an action plan for Plaintiffs. According to Patterson-Eachus, Plaintiffs achieved everything on the action plan. It is unclear whether this is the plan referred to in the letter. Plaintiffs received back pay for the time they were suspended.

Patterson-Eachus testified in her deposition that Mortimer instructed her to lower Plaintiffs' evaluations, which she did not agree with but did at his direction. Salaries at United are determined in part by performance evaluations. Patterson-Eachus also provided evidence that Mortimer had stated that Plaintiffs would never be allowed to be shift supervisors, a position that would assist their promotion within United, and that he refused to approve moving Plaintiff Dalvit to a day shift, despite Patterson-Eachus's numerous requests for this transfer. Mortimer also told the OMs that Plaintiffs would not be receiving any favors. According to Patterson-Eachus, Mortimer indicated his animosity was because of Plaintiffs' discrimination complaint. Plaintiffs testified that after their suspension Mortimer refused to acknowledge their presence.

Plaintiff Benjamin was thereafter assigned to the position of "day swing cargo relief supervisor," which was an outdoor job, while she was pregnant. Her replacement was a man. Plaintiff Dalvit eventually worked as a fill-in or temporary shift supervisor. She contends that she was denied more desirable shifts that she requested. Dalvit also was sent to be a fueling supervisor, despite her lack of experience in this area.

Plaintiff Benjamin testified in her deposition that she previously heard Nail refer to

women employees in derogatory terms, including "f-ing bitch" and "whore." Plaintiff Dalvit testified that Mortimer was often sarcastic and condescending to female employees but not to males; she also offers evidence that she heard him say that women should be at home, barefoot and pregnant, in the kitchen. Another male manager, Larry Everett, testified that he had observed that Mortimer yelled at female employees more than men and generally treated women more harshly. Everett testified that he once expressed dismay at such treatment to Mortimer, saying in response to one such episode, "That's just wrong" and that Mortimer responded, "They'll get over it." Denise Van Dyke, the third woman on the FIT team during the relevant time period, also testified about her observations of Mortimer belittling women. Van Dyke was also removed from the FIT team. Van Dyke related that Nail told her she had been moved to an unfavorable shift because of her association with Plaintiffs. Patterson-Eachus also testified that Mortimer treated men and women differently. She gave as an example a meeting she attended in which men were getting up and down and coming and going, but that when Patterson-Eachus got up to leave for a shift, Mortimer told her to sit down. Mortimer demoted Patterson-Eachus in August 2006, allegedly for reasons unrelated to performance.

Plaintiffs were apparently replaced by two men on the FIT team. Van Dyke was replaced by a woman who had a close association with Nail, the nature of which is disputed.

After exhausting their administrative remedies, each Plaintiff filed a lawsuit, thereafter consolidated into this action. Plaintiff Dalvit asserts the following claims: (1) discrimination and retaliation in violation of Title VII; (2) discrimination and retaliation in

violation of C.R.S. §§ 24-34-401 *et seq.* Plaintiff Benjamin asserts the following claims: (1) discrimination and retaliation in violation of Title VII; (2) retaliation in violation of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*; (3) discrimination and retaliation in violation of C.R.S. §§ 24-34-401 *et seq.* Dalvit left United after the initiation of this lawsuit and thereafter filed a second charge of discrimination with the EEOC alleging that she had been constructively discharged.

<u>Standard of Review</u>

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.*

A plaintiff alleging employment discrimination may prove intentional discrimination by direct or indirect evidence. In the absence of direct evidence, the analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for assessing indirect, or circumstantial, evidence. *Kendrick v.*

11

*Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  Under this analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination. *Kendrick,* 220 F.3d at 1226.  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action.  *Id.* at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination.  *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).

The plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy or credence and hence that the employer did not act for the asserted non-discriminatory reasons."  *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005); *see also Kendrick*, 220 F.3d at 1230 (three ways of showing pretext are:  (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

To make out a *prima facie* case of discrimination under Title VII , the plaintiff must show (1) membership in a protected class, (2) an adverse employment action, and (3) disparate treatment among similarly situated employees.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).  At the *prima facie* stage, the plaintiff's burden is

"not onerous" and the plaintiff need only raise the inference of discrimination. *Id.*
(citations omitted).

The burden shifting approach also applies to a claim of retaliation. To establish a
*prima facie* claim under Title VII for retaliation, a plaintiff must establish three elements:
(1) the plaintiff engaged in protected opposition to discrimination; (2) a reasonable
employee would have found the challenged action materially adverse; and (3) a causal
connection exists between the protected activity and the materially adverse action.
*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)
(citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405,
165 L.Ed.2d 345 (2006)).

A *prima facie* case of retaliation for exercising rights under FMLA involves the
following: (1) the plaintiff availed herself of a protected right under the FMLA; (2) she
was adversely affected by an employment decision; and (3) there is a causal connection
between the two actions. *Morgan v. Hilti, Inc* ., 108 F.3d 1319, 1325 (10th Cir. 1997).

Discussion

A.    <u>Motion to Strike and Motion to Amend</u>

I will first address Defendant's Motion to Strike Declarations (doc no 45), and
Plaintiffs' Motion to Substitute Amended Declarations In Opposition to Motion for
Summary Judgment (doc no 53). Plaintiffs included as evidence in their response to the
Motion for Summary Judgment declarations, or affidavits, signed by them under penalty
of perjury. *See* Exh. 5, 6 to Resp. to Motion for Summary Judgment, "Declaration of
Dava Dalvit Pursuant to 28 U.S.C. § 1746" (doc no 33-6), "Declaration of Debra
Benjamin Pursuant to 28 U.S.C. § 1746" (doc no 33-7). Defendant seeks to strike these

13

declarations on the following grounds: (1) they are made upon information and belief, rather than personal knowledge; (2) they do not set forth facts that would be admissible in evidence, but rather contain hearsay, irrelevant statements, conclusory allegations, legal argument, statements that could not plausibly be premised upon personal knowledge, and statements that are too vague, incoherent, or incomplete to be useful; and (3) Plaintiff Dalvit's declaration contradicts her sworn deposition testimony. Plaintiffs oppose the motion, and seek, by separate motion, to amend the declarations to remove the introductory statement in each declaration indicating that the declaration is "upon information and belief." Plaintiffs otherwise would not alter the content of the declarations.

I agree with Defendant that the declarations should be stricken. Even if they are amended to delete the introductory statement ("I, [Plaintiff], state as follows upon information and belief . . ."), they do not set forth <u>facts</u> based on the personal knowledge of the Plaintiffs as would be admissible in evidence, as required by Fed. R. Civ. P. 56(e). Rather, the declarations contain primarily (1) information that is cumulative of other evidence on the record (including statements duplicating Plaintiffs' own deposition testimony and that of other witnesses); and (2) conclusory, unsubstantiated statements. See, e.g., Dalvit Declaration at ¶ 15 ("I know that Jean Massey claims that she wrote the letter placed in our file. That comment and that letter could never have been placed in our files without the approval of Kevin Mortimer. Nothing like that ever happened in the Denver ramp without Kevin's fingerprints being all over it."). "While an affidavit is certainly an appropriate vehicle to establish a fact for summary judgment purposes, the affidavit must set forth facts, not conclusory statements." *BancOklahoma Mortgage*

*Corp. v. Capital Title Co.*, 194 F.3d 1089, 1101 (10th Cir. 1999); *see also Bones v.*

*Honeywell Intern.*, *Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated

allegations carry no probative weight in summary judgment proceedings.") (citations

omitted).

The majority of the declarations simply repeat and argumentatively

recharacterize other evidence. Beyond that, Plaintiffs merely present their inferences

and conclusory assertions regarding Mortimer's control over the department and

practice of discriminating against women, United's knowledge and the knowledge of

various managers, and United's alleged anti-women culture[7], and efforts to "bury"

Plaintiffs' complaint. Plaintiffs also present conclusory statements regarding differential

treatment between men and women, but present no facts to show that they have

knowledge of the underlying events. For example, Plaintiff Dalvit asserts in her

declaration, "An employee named Paul Fishler was investigated for leaving work early,

and Jean Massey conducted the investigation. But he was not suspended without pay,

like we were. And the investigation was ultimately dropped with no discipline." Dalvit

Declaration at ¶ 7. Aside from offering no facts about when this occurred, whether this

employee was in the same department as Plaintiffs and subject to the same policies

and management as Plaintiffs (he was apparently not on the FIT team), and whether he

was a management level employee like Plaintiffs, Plaintiff offers no facts indicating that

she was privy to the presumably confidential details of the investigation, including what

---

[7] See Benjamin Declaration at ¶ 9 ("It's a good old boy club and if you have one misstep management will come down on you, whereas the men get away with everything").

triggered the investigation or its outcome.

Plaintiffs argue in response that the hearsay portions of the declarations are admissible because they are admissions of a party opponent. While some of the hearsay statements contained in the declarations may be admissible on this basis, this is not the case when Plaintiffs merely restate and recharacterize another witness's deposition testimony, as is the case here. Plaintiffs also argue that their lay witness conclusions and observations are admissible pursuant to FRE 701. Plaintiffs' argument misses the point, however, as it fails to distinguish between Plaintiffs' opinions, which could be admissible in trial if the requirements of Rule 701 are satisfied, and facts. Plaintiffs' opinions, offered with little or no foundation, are not facts pursuant to Fed. R. Civ. P. 56(e) and are not sufficient to create genuine issues for the purposes of defeating Defendant's motion. *See Salguero v. City of Clovis,* 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004) ("these assertions are not supported in the record nor does [plaintiff-appellant's] affidavit demonstrate any personal knowledge or corroborating evidence, and, as such, are insufficient to create a genuine question of material fact . . ."). Although some portions of the declarations may be admissible as facts based on the personal knowledge of the Plaintiffs, such information appears elsewhere in the record and will be considered on that basis. Accordingly, Defendant's motion will be granted.

Plaintiff's proposed amendment, to indicate that the information is based on Plaintiffs' knowledge rather than "upon information and belief," will not cure the significant deficiencies in the affidavits. Therefore, I will deny Plaintiffs' motion to amend as futile.

B.    Motion for Summary Judgment

    1.    Title VII discrimination and retaliation

Defendant argues that Plaintiffs cannot establish a *prima facie* case because

they cannot show an adverse action or disparate treatment (or other circumstances

giving rise to an inference of discrimination).  In addition, Defendant contends that even

if Plaintiffs could establish *prima facie* cases, they could not demonstrate that United's

actions were pretextual.  Defendant makes a similar argument with respect to Plaintiffs'

retaliation claim, i.e., that Plaintiffs cannot show adverse action and cannot show that

any adverse action was causally connected to their protected activity.  I will address

each alleged adverse action in turn.

Suspension without pay: There is little doubt this could be an adverse action in

light of the United States Supreme Court's recent ruling in *Burlington Northern*, a Title

VII retaliation case involving indefinite suspension without pay, even if the pay is

eventually restored.   126 S.Ct. 2417-18 (upholding jury's finding that indefinite

suspension without pay was materially adverse, even where back pay was given after

suspension ended).  The cases cited by United all pre-date the *Burlington Northern*

decision and are inapplicable.

Moreover, I conclude that Plaintiffs have proffered some evidence to establish

that they were treated differently from the men on the FIT team.  Plaintiffs have offered

evidence, some of which may be admissible, that some of their male team members

may have worked shorter days but were not investigated and suspended for it.

Accordingly, I conclude that Plaintiffs may be able to establish a prima facie case in this

regard.

Notwithstanding, I agree that Plaintiffs cannot demonstrate that the non-discriminatory reason for the suspension was a pretext for unlawful discrimination. It is undisputed that the investigation of Plaintiffs was triggered by complaints from at least two other employees or managers outside of the group. Moreover, according to Nail, the spreadsheets he assembled showed that Plaintiffs and VanDyke[8] worked less than eight hour shifts on some days, but that the other team members appeared to have worked full shifts.[9] Plaintiffs have not rebutted this testimony and their unsupported allegations of intentional destruction of evidence are not sufficient to do so. Again, the undisputed evidence shows that all of the spreadsheets were provided to Massey, who by all accounts was an independent investigator. There is no evidence that Mortimer or Nail somehow prejudged or influenced the decision. It was Massey's decision, based on the evidence she had, to suspend the Plaintiffs during the investigation.

It is well-established in this circuit that ""[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alteration omitted); *see also Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate

---

[8]There is no explanation for why VanDyke, who apparently committed the same alleged infractions as Plaintiffs, was not also investigated and placed on suspension. However, since VanDyke is in the same protected class as Plaintiffs, the more favorable treatment she apparently received does not give rise to an inference of discrimination.

[9]There is also evidence that while Plaintiffs did not inform Nail when they were leaving early (because they justifiably believed it was not necessary), the other team members may have kept Nail better informed.

plaintiff."). Thus, even if the stated reasons later prove to be untrue, I must examine whether the supervisor believed those reasons and made a good faith decision at the time of the discharge. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Comp.,* 468 F.3d 1243, 1250 (10th Cir. 2006) (citations omitted).

Plaintiffs have provided no evidence tending to show that Massey did not honestly believe that the complaints, spreadsheets, and information she received from Nail showed that Plaintiffs had worked shifts of less than eight hours and that this was contrary to the instructions of Nail and company policy. Similarly, there is no evidence in the record from which a reasonable jury could infer that Massey, at the time she made the decision to suspend Plaintiffs, knew that men on the team had left early but were not being investigated for it. It does appear to be unfair that Plaintiffs were suspended based on conduct that they believed in good faith was approved by their manager, but that does not make it discriminatory.[10]

Plaintiffs argue that pretext is shown because Massey should have known at the time of the suspension that Plaintiffs were innocent. I disagree that the evidence before

---

[10]Plaintiffs also appear to argue that discrimination is shown because Nail had made sexist comments in the past, and Nail brought the issue to Mortimer's attention. A plaintiff must demonstrate a nexus between allegedly discriminatory statements made by a supervisor and the adverse action. *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994). To demonstrate the causal nexus, the plaintiff must show that "the allegedly discriminatory comments were directed at [the plaintiff], her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff." *Id.* I see no such connection here, particularly where the investigation was triggered by complaints from at least two other employees or managers.

Massey at that time was so compelling that she should have known that no rule violation had occurred. Nail told Massey that he had instructed his team they could work flexible hours but were still expected to work full eight hour shifts. The spreadsheets showed that Plaintiffs had worked less than eight hours on certain days, even if they had made up that time on other days. Based on this evidence, I cannot conclude that Massey's belief that Plaintiffs may have violated United's rules was unjustified or implausible.[11]

Plaintiffs also contend that the evidence of Mortimer's conduct after their suspension demonstrates pretext at the time of the suspension decision, as does the alleged "good old boy" culture of United. Again, I disagree. Although Mortimer's actions and statements are relevant to other claims by Plaintiffs, they are irrelevant here. Despite Plaintiffs' conclusory assertions that Mortimer controlled every event in this story, the undisputed evidence shows that Massey was the decisionmaker with respect to the suspension, which was approved by a Chicago human resources representative. Similarly, Plaintiffs' evidence regarding a general practice of United to discipline women for time sheet violations but not men is vague and lacking in foundation; such decisions apparently involved numerous different managers making decisions at unrelated times and under different circumstances, and Plaintiffs clearly do not have personal knowledge the details of all such personnel decisions. Their conclusory assertions that men were treated more favorably then they were in "identical" circumstances is lacking

_____

[11]Massey interviewed the other team members approximately a week or two later and discovered that they had the same understanding as Plaintiffs regarding hours. It appears that shortly thereafter she determined there was no rule violation and returned Plaintiffs to work.

in foundation, as Plaintiffs have presented little or no information about the underlying facts of their supposed comparators.[12]  Plaintiffs have pointed to no facts in evidence to indicate that Massey's decision was a pretext for unlawful discrimination.  Accordingly, I agree that Plaintiffs' claim of discrimination, to the extent it is based on United's decision to suspend Plaintiffs without pay during the investigation, should be dismissed.

I note that Plaintiffs have not asserted that they engaged in any protected opposition to discrimination before the suspension; accordingly, to the extent that Plaintiffs contend that the suspension was retaliatory, such a claim should also be dismissed.

Removal from FIT Team: Although Plaintiffs' assignment to the FIT team did not mean an increase in pay, tangible benefits, or a promotion, Plaintiffs have presented some evidence that it could assist in advancement at the company (or at least was believed to at the time).  Plaintiffs appear to argue that, as a corollary, removal from the team would harm their future employment with United.  Employment actions that impact an employee's future career prospects can be adverse for the purposes of Title VII. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996); *see also Robinson-Reeder v. Am. Council on Educ.,* 532 F.Supp.2d 6, 16 (D.D.C. 2008*).*

Here, however, Plaintiffs have offered no evidence, other than their own

_____

[12]As discussed, Plaintiffs did present evidence that they observed the male FIT team members leaving early, but it is not clear whether this occurred when these co-workers were assigned to FIT or whether Plaintiffs were in a position to know whether these individuals had worked full shifts on the days they allegedly left early.  Even this, however, does not mean that circumstances were identical; Plaintiffs were the subject of complaints by other managers and employees and had missed a briefing that they were told by their OM to attend, circumstances that do not appear to be present with other employees.

speculation, that removal from the FIT team could negatively affect their career advancement. The team was temporary, and indeed is apparently no longer in existence. There is no evidence that being a member of such a team was a prerequisite to any other positions at United, or that other hiring managers would have reason to question Plaintiffs' removal from a temporary special assignment. Accordingly, I agree with United that removal from the FIT team, standing alone, was not an adverse action.

Letter of Counsel: By contrast, Plaintiffs have presented evidence from which a reasonable jury could infer that the letter of counsel admonishing Plaintiffs amounted to an adverse employment action. The disputed and undisputed facts show that Plaintiffs would have to disclose this letter to other managers if they sought other jobs in the company. They have also presented evidence that a manager making a hiring decision could use a letter like this as a way of eliminating prospects and thus would reduce their chances of being promoted. Plaintiffs have presented evidence that this letter was going to remain in their files for five years, and thus could have a long-lasting effect. Moreover, the tone of the letter strongly suggests wrongdoing, even though it is undisputed that Plaintiffs did not violate any rules or policies. I take note that Plaintiffs were management level employees and would be seeking positions of responsibility; the letter suggests the writer has "doubt in your ability to successfully manage employees and lead the department on a special assignment," language that certainly could dissuade another United manager from hiring Plaintiffs in a more senior position.

I note that in most cases where the court found that warning letters were adverse there were typically numerous warnings or "write ups" that increased the employee's

chances of discharge, whereas this case involves a single warning letter. *See e.g.,*
*Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998). Nonetheless,
the Tenth Circuit instructs that I must "liberally interpret" whether an adverse
employment action exists, examining the unique factors relevant to the particular
situation. *Haynes v. Level 3 Comm'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006).
Given the circumstances presented here, I conclude that the letter of reprimand could
amount to an adverse action.

The next issue is whether there is evidence suggesting that the letter was
discriminatory or retaliatory. Again, the undisputed evidence is that Massey decided
that admonishment was appropriate. Although she informed Mortimer, there is no
evidence that he had any input in the content of the letter. In addition, it appears that
her decision was also supported by the human resources representative whom she kept
apprised during the investigation. Similarly, although aspects of this letter appear to be
unfair, as a jury could find that Plaintiffs acted in reliance on their understanding of
Nail's directions and there is evidence that Plaintiffs' discussions with other employees
did not violate any rule or practice, this does not raise an inference of discriminatory or
retaliatory motive. Again, it is undisputed that Plaintiffs did leave early, that they did
miss a briefing that their supervisor directed them to attend, that others complained
about their attendance, and that they did talk to other team members after being told
there was an investigation into their conduct. Given this, and the absence of facts
indicating a retaliatory[13] or discriminatory motive on the part of Massey or evidence that

_____

[13]It is undisputed that Massey did not learn of Plaintiffs' complaint of
discrimination until the initiation of this lawsuit.

she acted at Mortimer's behest, I cannot conclude that her reason for admonishing Plaintiffs was false, contrary to policy or practice, or otherwise indicative of pretext. There are simply no facts from which a jury could conclude that Massey did not honestly believe that Plaintiffs had acted inappropriately as members of management, even if their conduct did not violate any policy. As noted, it is not this Court's role to ensure fairness in the workplace, but only to provide remedies for such conduct that is prohibited by law. Accordingly, I agree that Plaintiffs cannot demonstrate that the decision to issue the admonishment letter was a pretext for unlawful discrimination or retaliation.

Action Plan: I agree with Defendant that the 90 day action plan implemented by Patterson-Eachus was not an adverse action. *Haynes,* 456 F.3d at 1224. There is no evidence that this affected Plaintiffs' tangible employment benefits in anyway or had any effect on their promotion prospects once it was completed.

Interference with Promotion and Evaluation: Plaintiffs have provided evidence that after Plaintiffs returned from suspension, Mortimer directly interfered with their professional advancement and evaluations, which in turn affected their salaries. Plaintiffs' evidence is that Mortimer refused to approve their transfers to a shift that would assist them in getting experience needed to advance. Similarly, Plaintiffs have presented evidence that Mortimer instructed their supervisor to lower their performance evaluations, and that such evaluations affect salary levels. These facts, if credited, would demonstrate an adverse action. Plaintiffs also have carried their burden to show that Mortimer's motivation in this regard was to retaliate against Plaintiffs for their complaint of discrimination. It is undisputed that Mortimer was aware of their protected

24

activity at this time.  In addition, Patterson-Eachus's testimony provides direct evidence that Mortimer sought to retaliate against Plaintiffs by preventing their transfers and promotions and by lowering their performance evaluations.

Defendant, however, contends that Plaintiffs cannot base their claim on this conduct because it was not included in their charge of discrimination to the EEOC.  An employee may not assert a claim under Title VII claim based on conduct not first asserted in a discrimination charge filed with the EEOC or other proper administrative agency.  *Holmes v. Utah, Dept. of Workforce Services*, 483 F.3d 1057, 1070 (10th Cir. 2007).

Both Plaintiffs filed charges of discrimination with the Colorado Civil Rights Division and EEOC on or around April 13, 2005.  Exh 20, 21 to Resp. to Motion for Summary Judgment (docs no 33-21 and 33-22).  Both Plaintiffs checked the box on the first page of the charge form for "Retaliation."  As particulars underlying the charge, Plaintiffs refer to the suspension, removal from special assignment, probation, disciplinary letter, and pay disparities (a claim later dropped by Plaintiffs).  Dalvit submitted a second charge of discrimination on or around September 21, 2007, in which she alleged that she was constructively discharged on or around August 10, 2007.  Exh. 30 to Resp. To Motion for Summary Judgment (doc no 33-31).  In it, she asserts that she suffered harassment and retaliation as a result of complaining about discrimination, specifically that she applied for numerous jobs but her application was not processed, that she was placed on an action plan and had a disciplinary letter placed in her file, and that the company failed to investigate her discrimination complaint.  The issue before me, then, is whether Mortimer's alleged conduct reasonably falls within the charges of

discrimination filed by Plaintiffs. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) ("A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.").

The Supreme Court has made clear that each discrete incident of discriminatory or retaliatory conduct constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003). Although Plaintiffs clearly asserted a charge of discrimination based on alleged retaliation, they did not include the specific retaliatory acts identified by Patterson-Eachus in her deposition. I conclude that these acts, i.e., preventing Plaintiffs from transferring to other shifts and directing that Plaintiffs' performance evaluations be lowered, are discrete incidents that must first be the subject of an administrative charge before being heard in this court.[14] I understand that Plaintiffs did not discover this evidence until after the commencement of the litigation, which could toll the time for filing such a charge, but this does not excuse the exhaustion requirement. *Martinez*, 347 F.3d at 1210-11 (exhaustion rule "is equally applicable . . . to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint.") (emphasis in the original). Accordingly, I agree with Defendant that Plaintiffs' claims cannot be premised on this alleged adverse action.

---

[14]I do not opine as to whether these actions are fairly encompassed in Dalvit's second charge of discrimination (i.e., constructive discharge); as discussed below, the second charge is now the subject of a separate lawsuit.

Constructive Discharge and Hostile Work Environment: As discussed above, Dalvit has also asserted that she was constructively discharged and subjected to a hostile work environment. A right to sue letter on Dalvit's second charge of discrimination was issued February 1, 2008, after United filed its Motion for Summary Judgment. Although Plaintiff initially sought to amend her complaint to assert a constructive discharge claim, she has withdrawn that motion and filed a separate lawsuit concerning this claim (Civil Action No. 08-cv-00881-RPM). Nonetheless, in her supplemental brief, Plaintiff argues that the second charge of discrimination and right to sue letter can be retroactively applied to allegations contained in the complaint now governing this lawsuit. I disagree. Such a proposition completely ignores the legislative scheme governing Title VII claims, which requires exhaustion of administrative remedies before such claims can be asserted in a lawsuit. Plaintiff did not provide any legal authority demonstrating that a party can reverse this order by preemptively asserting claims that have not yet been exhausted and then later "curing" this defect with a later-filed charge of discrimination. I agree with Defendant, moreover, that permitting this would cause Defendant prejudice, as discovery and summary judgment briefing was based on the claims contained in the first charge of discrimination and the complaint derived from it. Accordingly, I conclude that the question of whether Plaintiff Dalvit was constructively discharged and or suffered retaliation or discrimination from a hostile work environment is not at issue in this case.

3.    Retaliation for exercise of FMLA rights

Defendant first argues that Plaintiff Benjamin cannot base her FMLA claim on any events occurring more than 300 days before the filing date of her EEOC charge.

Defendant cites no appropriate legal authority for this proposition, as it has conflated the remedies for FMLA with Title VII. FMLA has its own enforcement provisions under 29 U.S.C. § 2654, which permits an employee to file a complaint with the Secretary of Labor or to file a private lawsuit. If the employee files a private lawsuit, "it must be filed within two years after the last action which the employee contends was in violation of the Act, or three years if the violation was willful." 29 C.F.R. § 825.400(b). Accordingly, I will consider Plaintiff's evidence of alleged adverse actions occurring up to two years prior to the filing of her lawsuit.

Notwithstanding this timeline, however, I agree that Plaintiff Benjamin cannot demonstrate a prima facie case of retaliation for her use of FMLA time. In her response brief, she argues that causation is shown by the following chain of events: "(a) plaintiff was chastised by Steve Peters for her dependability in connection with her use of her FMLA, (b) plaintiff complained to the ramp manager [i.e., Mortimer], who warned Peters of the legal prohibition against taking an adverse action against an employee for use of FMLA, (c) Peters then placed plaintiff on an action plan relating to her dependability, (d) Peters then falsely complained to plaintiff's new boss on special assignment with the FIT team (Nail) that he thought plaintiff was shorting the company on hours worked, (e), which falsely triggered an investigation and gave Mortimer the opportunity to suspend plaintiffs without pay for one month, followed by a string of adverse actions." Plaintiffs' Opp. (doc no 31) at 31 n. 6.

Even if Plaintiff could demonstrate that Peters retaliated against her by making a false complaint, which then triggered the investigation, this fact is immaterial. It is undisputed that at least one other employee also complained about Plaintiffs'

attendance while they were on the FIT team.  Moreover, as discussed above, the relevant decisionmaker thereafter was Massey, and there is no evidence that Massey was aware of Plaintiff's use of FMLA or that Peters influenced the course of the investigation or its outcome in any way.  These events, therefore, do not constitute adverse actions causally connected to Plaintiff's FMLA leave.

Plaintiff testified in her deposition that Peters, when he was her supervisor, placed her on several action plans regarding her "dependability."  Defendant disputes that this was the reason for the action plans but offers no contradictory evidence. Nonetheless, as discussed above, I conclude that the action plans, without more, were not adverse actions sufficient to support a claim of retaliation under FMLA.  Moreover, it appears that Peters thereafter gave Defendant Dalvit a positive performance review and she was invited to be on the FIT team.  Under these circumstances, I conclude that Plaintiff Benjamin's FMLA retaliation claim also fails as a matter of law.

Accordingly, it is ordered:

1.      Defendant's Motion for Summary Judgment (doc no 28) is granted. Summary judgment shall enter in favor of United Air Lines, Inc., and against Plaintiffs on all claims.

2.      Defendant's Motion to Strike Declarations (doc no 45) is granted.

3.      Plaintiff's Motion to Substitute Amended Declarations in Opposition to Motion for Summary Judgment (doc no 53) is denied.

4.      Defendant may have its costs.

5.    Defendant's Motion to Dismiss (doc no 83) is denied as moot.

DATED at Denver, Colorado, on August 11, 2008.

                                        BY THE COURT:


                                        s/ Walker D. Miller
                                        United States District Judge